UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1)    JEFF TREVILLION, as Special Administrator for the Estate of Louis Perales, deceased,<br><br>Plaintiff,<br><br>v.<br><br>(2)    SCOTT OWEN, in his individual and official capacity as Sheriff Washington County, Okla.; and<br>(3)  JAMES WATHEN, III,<br>(4)  JOSHUA DURHAM,<br>(5)  ANDREW GALANIS,<br>(6)  DAVID KERR,<br>(7)  ETHAN DONOVAN,<br>(8)  JORDAN INMAN,<br>(9)  MICHAEL HOPPER,<br>(10) MICHAEL KITCHENS,<br>(11) RANDY MORGAN,<br>(12) SETH O'NEAL,<br>(13) AARON WITT,<br>(14) BRANDI UNDERWOOD,<br>(15) COLTON TATTERSHALL,<br>(16) JOSEPH RAMERIZ, and<br>(17) REED BLACKARD,<br>all in their individual capacities,<br><br>Defendants. | Case No.: 4:22-cv-00473-JAR-MTS |

## OPINION AND ORDER

Jane A. Restani, Judge[*]:

Jeff Trevillion, as Special Administrator for the Estate of Louis Perales, deceased ("the Estate"), filed a claim under 42 U.S.C. § 1983 ("Section 1983") for cruel and unusual punishment in violation of Louis Perales' ("Perales") Eighth and Fourteenth Amendment rights. Compl. at 1, 11–15, ECF No. 2 (Oct. 25, 2022) ("Compl."). The Estate brings this claim against the arresting officer and the jail staff in their individual capacities, and Sheriff Scott Owen ("Owen") in his official capacity. Id. at 1. Pending before the court is a motion for summary judgment filed by Sheriff Owen. Def. Scott Owen's Mot. for Summ. J., ECF No. 88 (July 31, 2025) ("Def.'s Mot."). For the reasons set forth below, the court denies Owen's motion.

### I.  Factual Background

The court presumes familiarity with the facts of the case. On November 3, 2020, Officer James Wathen ("Wathen") responded to a report of a naked adult male "having a mental episode" in a motel. James Wathen Initial Narrative Report at 1, ECF No. 88-2 (July 31, 2025) ("Incident Narrative Report"). When he arrived on the scene, he found Perales naked and covered in urine in a bathroom that was covered in human feces. Id. Perales was waving his arms and talking incoherently. Id. Perales had an outstanding warrant. Dep. of Officer James Wathen at 24:22–24 ("Wathen Dep."), ECF No. 97-1 (Aug. 27, 2025). Wathen called EMS to the scene to check Perales' health before taking him into custody for the outstanding warrant.

---

[*] Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

2

Incident Narrative Report at 1.  EMS did not find any immediate medical issues, id., but EMS was still willing to transport Perales to the hospital.  See Wathen Dep. at 66:20–67:1.  Perales refused, and Wathen transported him to the Washington County Jail ("the jail").  Incident Narrative Report at 1.

At the jail, Perales was unable to sign his bond sheet because of his flailing arms.  Id.  The jail placed Perales in a holding cell where he could sober up to the point where he could complete the booking process.  See Dep. of Josh Durham at 21:3–7, ECF No. 88-6 (July 31, 2025) ("Durham Dep.").  While in the holding cell, Perales continued to defecate on himself, with jail staff cleaning him and offering him food and water.  See CCTV Video at 1:24:26, 2:27:15, 9:42:17, 15:58:47, 19:40:39, ECF No. 97-8 (Aug. 27, 2025) (filed under seal and by conventional means) ("CCTV Video").  On the morning of November 4, 2020, jail staff found Perales unresponsive in his cell.  Id. at 20:33:07.  Perales was pronounced dead at the hospital, with the cause of death listed as atherosclerotic cardiovascular disease exacerbated by methamphetamine.  Compl. at 10.

## II.   Standard of Review

Summary judgment is warranted when "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citation modified).  The party moving for summary judgment "bears the initial responsibility . . . [of] identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate

the absence of a genuine issue of material fact." Id. at 323 (citation modified). The court will not scour the record for evidence that a party fails to bring to the court's attention. Cf. Orr v. City of Albuquerque, 417 F.3d 1144, 1151 (10th Cir. 2005). The court, however, will not close its eyes to authentic video evidence that tells a clear story of the events in question. See Scott v. Harris, 550 U.S. 372, 378–80 (2007).

### III. Discussion

### A. What constitutes the jail's policy or practice cannot be resolved on summary judgment

Owen argues that the policy of the jail was to give every inmate adequate medical care. Def.'s Mot. at 18–19. He asserts that the jail's policy was to assess whether each new inmate needs medical attention and that jail employees are instructed to get immediate medical care for severely intoxicated inmates. Id. at 19. Owen, however, admits that "[t]he jail had an informal custom of placing intoxicated inmates in holding cells until they sobered up." Id. at 20. The Estate responds that the jail's policy in reality was to place intoxicated inmates in holding cells to "sober up" without "a medical assessment to determine risk . . . [, a] time limit[,] . . . [or a] requirement to take vital signs to evaluate the trajectory of their condition, even where the need to obtain vital signs was required by written policy." Resp. in Opp. to Mot. for Summ. J. at 18, ECF No. 97 (Aug. 27, 2025) ("Pl.'s Resp.").

While municipalities may be held liable for constitutional violations under Section 1983, they cannot be sued "for an injury inflicted solely by its employees or agents." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978).

4

Instead, the plaintiff must show that their injury was caused by the "execution of a government's policy or custom." Id. Municipal liability "may be based on a formal regulation or policy statement, or it may be based on an informal custom so long as this custom amounts to a widespread practice that . . . is so permanent and well settled as to constitute a custom or usage with the force of law." Brammer-Hoelter v. Twin Peaks Charter Acad., 602 F.3d 1175, 1189 (10th Cir. 2010) (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988)) (citation modified).

The written policy from the jail directs staff to give inmates "individualized orders for observation and care" if "the inmate is determined to be acutely intoxicated." Washington County Sheriff's Office Intoxication and Withdrawal Policy at B.3, ECF No. 88-21 (July 31, 2025) ("Intoxication Policy"). Any intoxicated inmates will be transferred to the hospital "[i]f the inmate's condition deteriorates during the detoxification process," id. at B.7, or if they have "altered consciousness or stupor, unstable vital signs, irregular or extreme paranoid behavior." Id. at B.1(a). This is in addition to the jail's intake policy, which directs officers to "determine if the inmate is in need of immediate medical attention." Washington County Intake of Inmates Policy at A.2, ECF No. 88-20 (July 31, 2025) ("Intake Policy"). The jail, however, had an informal policy of placing acutely intoxicated inmates into holding cells to "sober up." Def.'s Mot. at 20; Witt Dep. at 20:20–23:02, ECF No. 97-5 (July 31, 2025).

The arresting officer suspected that Perales was suffering from acute methamphetamine intoxication and communicated that to jail staff. James Wathen Suppl. Narrative Report at 1, ECF No. 88-5 (July 31, 2025). The arresting officer also

knew that methamphetamine intoxication can cause serious health issues and was aware that Perales had medication for high blood pressure. Wathen Dep. at 51:3–14, ECF No. 88-1 (July 31, 2025); James Wathen Suppl. Narrative Report at 1. Perales arrived at the jail flailing his arms so much that he could not sign his bond sheet. Incident Narrative Report. The jail staff knew he was so intoxicated that he was a "fall risk" and placed him in a padded holding cell so that he would not injure himself. Durham Dep. at 18:7–19:4. Jail staff confirmed that inmates like Perales were often put in holding cells on the assumption that they would become sober after sleeping. Id. at 33:4–24. Once in the cell, Perales continued to flail, fall over, defecate on himself, and scream almost continuously for 20 hours. See CCTV Video. It does not appear that jail staff or the nurse ever took Perales' vital signs until he was found unresponsive. See id.

Based on the facts in the record, the court denies summary judgment on the issue of the adequacy of the jail's policy or practice. The jail's written policy shows a comprehensive system to provide intoxicated inmates individualized medical care and a willingness to send them to the hospital if needed. Owen, however, admits that the jail also had an informal custom of sending intoxicated inmates to holding cells to "sober[] up" and has not presented any evidence to suggest that this custom includes taking the inmates from the holding cells to a hospital if their conditions deteriorate. Def.'s Mot. at 20. At the very least, this custom is in tension with the written policy, which requires that inmates with "altered consciousness or stupor" be "sent to the hospital for treatment." Intoxication Policy at B.1. Because Owen fails

6

to explain how the jail reconciles this custom with the written policy, summary judgment is inappropriate at this juncture.

Further, the behavior of the jail staff in this case does not align with the written policy. Perales was clearly suffering from "altered consciousness," "stupor," and "paranoid behavior" given his methamphetamine intoxication and his condition inside the holding cell. See Intoxication Policy at B.1; see generally CCTV Video. He was not sent to the hospital, and jail staff confirmed that it is normal practice not to send severely intoxicated inmates to the hospital. Durham Dep. at 33:4–24. Perales' condition also arguably deteriorated over time, given that he essentially did not sleep for 20 hours, continued to defecate on himself even after 10 hours of "sobering up," and continuously flailed his arms and yelled. See generally CCTV Video. Despite this, jail staff did not check his vital signs or appear to give him individualized care. See generally id. These actions contradict the written policy. As a result, summary judgment is inappropriate because, based on the undisputed facts of the conditions of Perales' death, it is not clear that the jail's policy or practice sufficiently afforded Perales the level of medical care required by the Eighth and Fourteenth Amendments.

**B. Summary judgment is denied on the issue of the existence of deliberate indifference**

Owen argues that the jail staff could not have shown deliberate indifference to Perales' medical needs because they were not aware of any substantial risk of harm. Def.'s Mot. at 12–18. Owen contends that this is because Perales appeared "ok," was

7

behaving normally for an intoxicated inmate, and had not presented any obvious signs of medical distress. Id. at 14–18. The Estate responds that the jail staff were deliberately indifferent to Perales' medical needs in violation of his constitutional rights because of past incidents of intoxicated inmates in the jail dying in their cells and because of Perales' underlying conditions, of which the jail staff were aware. Pl.'s Resp. at 19–21; Wathen Dep. at 17:14–23.

Jail staff violate an inmate's Eighth Amendment right to freedom from cruel or unusual punishment when they show "deliberate indifference" to his serious medical needs. Paugh v. Uintah Cnty., 47 F.4th 1139, 1153 (10th Cir. 2022) (citation omitted). Deliberate indifference falls "somewhere between the poles of negligence at one end and purpose or knowledge at the other." Farmer v. Brennan, 511 U.S. 825, 836 (1994). The standard has both an objective and subjective component. Est. of Beauford v. Mesa Cnty., Colorado, 35 F.4th 1248, 1262 (10th Cir. 2022). "To satisfy the objective component, the alleged deprivation must be sufficiently serious to constitute a deprivation of constitutional dimension." Paugh, 47 F.4th at 1155 (citing Self v. Crum, 439 F.3d 1227, 1230 (10th Cir. 2006) (citation modified)). Death will always be a sufficiently serious deprivation to meet this objective prong. Id. at 1155–56. To satisfy the subjective component, the official must have known of and disregarded an excessive risk to the inmate's health or safety. Strain v. Regalado, 977 F.3d 984, 990 (10th Cir. 2020) (quoting Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005)). This knowledge requirement is met when an official "decline[s] to confirm inferences of risk that he strongly suspect[s] to exist." Farmer, 511 U.S. at 843 n.8.

Whether the requisite knowledge existed is a fact-intensive inquiry that may be answered by inference from circumstantial evidence. Paugh, 47 F.4th at 1156 (quoting Farmer, 511 U.S. at 842).

Owen admits that Perales' death is a sufficiently serious medical condition to satisfy the objective prong of this analysis. Def.'s Mot. at 13. Perales may have answered the EMS' questions coherently early on, leading the arresting officer to believe that Perales was "clear" to be taken to jail. See Wathen Dep. 88:12–25. Jail staff knew Perales was intoxicated and suffered from high blood pressure. See id. at 20:8–21. Perales arrived at the jail flailing his arms so much that he could not sign his bond sheet. Incident Narrative Report at 1. Once in the holding cell, Perales' condition essentially did not change for 20 hours, during which time he did not sleep for more than a few minutes at a time. See CCTV Video. Jail staff visually checked on him while he was flailing and screaming on the floor but rarely entered the cell and never sent him to the hospital. Id. at 25:01, 53:12, 9:35:01, 14:05:27, 20:21:45. When he defecated on himself the first time, jail staff did not come to clean it up and check on him for a full hour, despite having a constant camera feed to his cell. Id. at 1:24:26, 2:27:15. When he defecated on himself the second time, he had blood coming out of his rectum, and jail staff called for the nurse. Id. at 2:19:06, 2:25:05. The nurse then checked his rectum area but did nothing more to check his vital signs. Id. at 2:25:05. He continued to flail and scream for multiple more hours until he defecated on himself again. Id. at 9:42:17. The jail staff took forty minutes to check on him and clean him up, and this time they did not call the nurse. Id. at 10:27:51. When jail

9

staff offered Perales food, he smashed the tray of food and did not eat.[1] Id. at 16:40:32. After over 15 hours, jail staff had to force-feed Perales water, as he had not drunk anything since coming to the jail. Id. at 19:40:39. Jail staff finally called for more serious medical attention once they found Perales unresponsive and without a pulse, after 20 hours in the holding cell. Id. at 20:33:07; Breton Nursing Note, ECF No. 88-15 (July 31, 2025).

The court also denies summary judgment on the issue of deliberate indifference. At the very least, jail staff knew that Perales had multiple underlying conditions and was suffering from acute methamphetamine intoxication yet did not get Perales even minimal medical care. Beyond that, the jail staff watched Perales' condition fail to improve for nearly a full day. Any observation of the video feed would have shown that Perales was not sleeping, eating, or drinking water while he screamed and vigorously moved over the course of the 20 hours. Even after ten hours of "sobering up," Perales continued to defecate on himself. These issues indicate that the jail staff may have known Perales was suffering from serious medical issues and failed to seriously respond to any of these signs. Their "sight checks" consisted mostly of seeing Perales flailing around on the floor and doing nothing in response. Even when the jail staff did call the nurse due to blood in Perales' stool, she did not take his vital signs.

---

[1] Nurse Sonia Breton testified that Perales ate his food, but the CCTV video shows that the "empty tray" she saw was a result of Perales destroying his tray and refusing to eat his food. See Excerpt from Dep. of Sonia Breton at 84:7–10, ECF No. 88-14 (July 31, 2025); CCTV Video at 16:43:10, 17:14:49.

Owen has failed to present sufficient evidence that this behavior met a reasonable level of care for Perales' serious medical needs. Not only does the video evidence contradict Owen's version of events, but he fails to present any evidence, such as an expert report to controvert plaintiff's expert, that shows the jail responded appropriately to Perales' medical needs. The court therefore concludes that there is enough evidence to preclude summary judgment on this issue.

**C. Summary judgment is denied on the claim of failure to supervise**

Owen argues that because all jail staff had the authority to call for extra medical assistance or send an inmate to hospital, no failure to supervise the staff caused Perales' death. Def.'s Mot. at 23. The Estate responds that the core issue in its failure to supervise claim is whether the jail left "intoxicated arrestees with serious acute medical conditions inside holding cells without regular monitoring or supervision." Pl.'s Resp. at 24–25 (emphasis removed).

As the court explained in its opinion denying the motion to dismiss, a failure to supervise claim requires an "affirmative link" between the supervisor and the constitutional violation. Est. of Booker v. Gomez, 745 F.3d 405, 435 (10th Cir. 2014) (quoting Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 767 (10th Cir. 2013)). When the affirmative link is not a result of direct participation by an official, "the elements for supervisory and municipal liability are the same."[2] Burke v. Regalado, 935 F.3d 960, 999 (10th Cir. 2019).

---

[2] The Tenth Circuit in Burke explained that when the supervisor is a municipal policymaker and the supervisor did not personally participate in the underlying constitutional violations, both supervisory and municipal liability require the same

The parties do not present any new facts on this claim beyond what they presented in their discussion of the municipality's policy or practice. Neither party discussed any facts relating to Sheriff Owen's supervision of jail staff, jail staff hierarchy, or anything similar in their briefs to the court.

The court denies summary judgment on the failure to supervise claim. At the summary judgment stage, the movant bears the burden of showing that there is no genuine issue of material fact, and that the movant is entitled to judgment as a matter of law. Celotex, 477 U.S. at 323. Owen has not presented any evidence that jail staff were properly supervised. From the facts discussed, lack of proper supervision may be inferred by the jury.

### D. Summary judgment is denied on the claim of failure to train

Owen argues that jail staff were trained in various methods of getting inmates medical attention, and that the county was not on notice of the need for further procedures. Def.'s Mot. at 21–23. Owen contends that this means that the Estate cannot show the required "deliberate indifference" for a failure to train claim. Id. The Estate responds that jail staff were not trained on how to identify health problems, take vital signs, or when to remove intoxicated inmates from holding cells. Pl.'s Resp. at 22–23.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick v. Thompson, 563 U.S. 51, 61

---

elements: (1) policy or custom, (2) "a causal relationship between the policy or custom and the underlying violation," and (3) "deliberate indifference." Burke v. Regalado, 935 F.3d 960, 998–99 (10th Cir. 2019).

(2011). To satisfy Section 1983, a municipality's failure to train must be relevant to the cause of the injury and must amount to "deliberate indifference to the rights of persons with whom the untrained employees come into contact." Id. (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989) (citation modified)). Municipal deliberate indifference liability ordinarily requires a pattern of similar constitutional violations by untrained employees. Id. at 62 (citing Bd. of Cnty. Comm'rs of Bryan Cnty, Okla. v. Brown, 520 U.S. 397, 409 (1997)).

Jail staff was not given specific training on how to handle inmates exhibiting involuntary movements due to severe intoxication. Dep. of Officer Randy Morgan at 12:5–24, ECF No. 97-18 (Aug. 27, 2025) ("Morgan Dep."). Nor did jail staff receive substantial training on how to handle intoxicated inmates in general. Id. at 17:1–18:2; see Dep. of Officer Ethan Donovan at 15:19–17:15, ECF No. 97-17 (Aug. 27, 2025) ("Donovan Dep."). The Estate asserts that the jail previously had six inmates subject to the "sober up" policy who were not initially medically screened and later suffered an "adverse medical event," resulting in the need to be taken to the hospital by ambulance.[3] Pl.'s Resp. at 7. According to Owen, new policies to deal with inmate intoxication were only implemented after Perales' death. Def.'s Mot. at 22.

The court denies summary judgment on this issue. Deposition testimony from both jail staff and Sheriff Owen do not conclusively show that jail staff received any formal training on how to handle intoxicated inmates or the side effects of severe

---

[3] Owen acknowledges one prior incident of an intoxicated person who allegedly died due to an untreated head injury. Def.'s Mot. at 13.

13

intoxication.  See, e.g., Morgan Dep. at 12:5–24; Donovan Dep. at 15:19–17:15; Dep. of Sheriff Scott Owen at 68:25–69:24, ECF No. 97-16 (Aug. 27, 2025).  The record evidence leaves open the issue of whether the jail was on notice that failing to train its employees on these issues could result in a lack of sufficient care for a prisoner's serious medical needs.  By Owen's admission, though, the jail did not increase medical training for staff until after Perales died.  Def.'s Mot. at 22.  This lack of training even after serious incidents precludes summary judgment on this issue at this stage.

## IV.   Conclusion

Defendant Sherriff Owen's Motion for Summary Judgment, ECF No. 88, is **DENIED**.

/s/ Jane A. Restani
Jane A. Restani, Judge

Date:  October 10, 2025
New York, New York